Argued February 23, resubmitted in banc May 15, reversed and remanded
June 13, reconsideration denied July 26, petition for review
denied September 19, 1978

In the Matter of Wyatt, Gina Mirrie, a child.
STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY et al, *Respondents,*
*v.*
WYATT, *Appellant.*
(No. 58,220, CA 9422)
579 P2d 889

Doreen Nepom, Milwaukie, argued the cause and filed the brief for appellant.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent Juvenile Department. On the brief were James A. Redden, Attorney General, Al J. Laue, Solicitor General, and Melinda L. Bruce, Assistant Attorney General, Salem.

No appearance for respondent Stevie Roberts.

GILLETTE, J.

**GILLETTE, J.**

The mother appeals from the order of the circuit court terminating her parental rights in her daughter, aged two. The petition for termination alleged that the mother is unfit by reason of conduct or condition seriously detrimental to the child and that integration of the child into the mother's home is improbable in the foreseeable future because of conduct and conditions not likely to change. ORS 419.523(2).[1]

The mother was herself made a ward of the juvenile court in 1975 at the age of 14. From the time until the termination hearing in October of 1977, she spent most of her time either in foster care or in Hillcrest School for Girls. While she was in foster care, the mother had custody of her child and cared for her under supervision. The mother had difficulty, particularly at first, in relating to the child as a person. She treated the child with some affection, as if the child were a doll, and displayed unreasonable expectations as to the child's capabilities. There is evidence that during this period the mother committed violent assaults on her foster sisters and a juvenile counselor, and engaged in other disruptive behavior. The mother was evicted from one foster home because of her

---

[1] "The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.

"(b) Conduct toward any child of an abusive, cruel or sexual nature.

"(c) Addictive use of intoxicating liquors or narcotic or dangerous drugs.

"(d) Physical neglect of the child.

"(e) Lack of effort of the parent to adjust his circumstances, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

behavior. The child was placed in a new foster home after the mother was committed to Hillcrest in March, 1977, following her admission of charges of prostitution. The mother had periodic visits with the child while at Hillcrest, but has not had custody of the child since her commitment.

Prior to her commitment to Hillcrest, the mother failed to follow through with opportunities made available to her to gain the custody of her child, including counselling, educational and parenting classes, and youth projects. However during the two to four month period prior to the hearing, the mother had demonstrated marked improvement in her behavioral patterns and self-control.

This case was tried to an able and experienced juvenile court judge, and we give some weight to the fact that he had an opportunity to observe the witnesses. *See State ex rel Juv. Dept. v. Maves,* 33 Or App 411, 576 P2d 826 (1978). Nonetheless, our review is *de novo,* ORS 419.561(4), and we are required to independently assess and evaluate the evidence. As we view it, the evidence shows the following:

(1) The mother in this case is now sixteen; she was fourteen when she had the child in question. She was at the time of the conception of her child beyond the control of her mother and stepfather. Much of her behavior then and since shows that she is a willful, hedonistic and totally self-indulgent person. She has not, however, from the testimony elicited in this case, ever done any harm to her child or indicated that she wished to.

(2) The mother has been committed to the Hillcrest School for an act of prostitution.

(3) The two expert witnesses, a clinical psychologist and a psychiatrist, each examined the mother once. The psychologist's principal activity consisted of administering certain tests from the Minnesota Multiphasic Personality Inventory (MMPI). He testified

that the mother's scores were high, that experience had shown a high correlation between high scores on the tests he had administered to the mother and parental abuse of the children, and that it was therefore more probable that the mother would abuse her child than would other people. The psychiatrist made a similar diagnosis of probability based upon the mother's history. Neither the psychologist nor the psychiatrist was able to offer any criticism of the mother's behavior with her child during the period of time they had an opportunity to observe the two together.

(4) While the mother exhibited certain unrealistic behavior toward the child, particularly when the child was very young, she modified her behavior when she was told it was inappropriate. Every witness testified that the mother claimed to love the child; her behavior toward the child supported this conclusion. Nonetheless, both social workers and both experts recommended termination of parental rights.

Boiled down, all the recommendations were based upon the fact that this mother is, as one witness put it, an "antisocial personality," who is more likely than the average person to be abusive to her child *some day.*

■ On this record, we cannot agree with the decision to terminate parental rights. The existence of a prognosis that a person will, at some time in the future, turn out to be a poor parent should not, standing alone, serve as the basis for terminating parental rights. There should be some demonstration of a present failure to properly perform the parenting role (as, for example, in the case of a severely mentally retarded parent) or, in the alternative, substantial certainty that the parent will not be able to perform that role with minimal adequacy.

Focusing our concern in the terms of the statute authorizing termination of parental rights, termination is authorized where a parent is found to be unfit,

"* * * by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the future *due to conduct or conditions not likely to change.*" ORS 419.523(2). (Emphasis added.)

The statute sets out several criteria to be considered in making the judgment. Only ORS 419.523(2)(e) has any applicability here:

"Lack of effort of the parent to adjust his circumstances, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that *no lasting adjustment can be effected.*" (Emphasis added.)

■ The burden of proof in these cases is by a preponderance of the evidence. ORS 419.525(2).[2] On *de novo* review, we are not independently satisfied that the conduct and conditions of the mother are not likely to change. Indeed, the evidence shows they have started to change already. We are likewise unpersuaded that "no lasting adjustment can be effected." An adjustment has begun; the mother is entitled to a chance to show it is permanent.

■ While the interests of the child are paramount, and the state is entitled to treat them as such, the interests of the parent also have constitutional stature and cannot be ignored. *State v. McMaster,* 259 Or 291, 486 P2d 567 (1971). On the evidence presented, we are unwilling to permit this child to be irretrievably

---

[2]The constitutionality of the requirement of proof by mere preponderance of the evidence was upheld in *State ex rel Juv. Dept. v. K.M.S.,* 26 Or App 219, 552 P2d 578 (1976), and in the companion case of *State ex rel Juv. Dept. v. P.J.P.,* 26 Or App 215, 552 P2d 584 (1976). Both cases were decided two to one, with the Chief Judge specially concurring on the ground that, although he believed proof should be required "beyond a reasonable doubt," he felt that standard had been met in both cases. Since the decision in *K.M.S.* and *P.J.P.,* we have mentioned the "preponderance of the evidence test" without comment in *State ex rel Juv. Dept. v. Scoles,* 29 Or App 109, 562 P2d 581 (1977), and we have held "beyond a reasonable doubt" that termination was justified in *State ex rel Juv. Dept. v. Thomas T.,* 30 Or App 385, 567 P2d 135 (1977).

removed from the orbit of a human being who, above all others, is most likely by virtue of societal norms and emotional proclivities to want to provide and to successfully provide that nurturing environment in which humans are entitled to grow.[3] Refusal to do so is particularly appropriate where, as here, this young woman (who is only now beginning to reach the earliest stages of maturity in the adult sense) has never had an opportunity to prove herself as a mother and to raise her own child.

This is a fairly close case, and we recognize that the course we choose creates a more substantial danger for the child than if we were to act now and terminate the parental rights of the mother. Such risks, however, are inherent in a democratic scheme which values fairness more highly than the occasional consequences of its application. Guided by *McMaster,* we feel society should make one more attempt to be "fair" to this mother, giving her what will doubtless be a final opportunity to prove herself.

■ Our refusal to terminate parental rights does not mean that the child has to be given back to the parent, or, if the child is returned to the parent, that the child-parent relationship cannot be closely supervised. *State v. McMaster, supra* at 303. We are confident that the trial judge will, on remand, devise a program of supervision which will provide for close examination of the mother's developing relationship with her daughter and—when and if the trial judge deems it advisable—the reuniting of mother and daughter.

Reversed and remanded.

---

[3] Although it is not the basis for our decision, we note that there are *two* human beings who may be helped here. The mother, who appeared a lost cause, has shown positive signs of maturing. In permitting her to keep her child we not only preserve the child's chance to be nurtured by the mother, but also provide the most positive encouragement to the mother to continue her efforts toward becoming a useful citizen.

**JOHNSON, J.,** dissenting.

I agree with the majority's statement of the facts but cannot accept the implications drawn therefrom. The ray of hope on which the majority relies is the testimony of Hillcrest officials that during the two-to-four-month period prior to the hearing, the mother had demonstrated improvement in her behavioral patterns and self-control. I view this testimony as only indicating that she has somewhat adjusted to institutional supervision, not as demonstrating that her attitude has changed or that she is fit to be a parent.

At the time the child was born the mother was patently unfit. Instead of terminating parental rights then, the state attempted to rehabilitate. The effort has not been successful. The mother subsequently committed violent acts against others, engaged in prostitution and demonstrated no interest in self-improvement. Her attitude toward the child at best reflects an affection for an object rather than a person. She is diagnosed by a psychiatrist and a psychologist as an anti-social personality who is likely to abuse her child. The two juvenile caseworkers who supervised the mother have recommended, based upon their close association with her, that parental rights be terminated. The trial court had an opportunity to observe these witnesses and also the mother who testified on her own behalf. The trial court obviously did not find her credible. The record indicates that the mother continues to be unfit.

The majority in one breath says the mother should have another "opportunity to prove herself as a mother and to raise her own child." In the next breath it backs away from that proposition and suggests instead that the child be retained in foster care, or in custody of the mother under close supervision. The reasonable expectation is that the trial court will elect continued foster care because the trial court expressed considerable skepticism concerning the mother's proposed living arrangements when she is released from Hillcrest. The

latter suggestion also presupposes the availability of social resources which may not exist. In the majority's zeal to protect the mother's interests it has subordinated the interests of the child. The possibility that this mother will ever become fit and be able to integrate the child into her home is at best remote. The probability is that in the meantime the child's life will be irretrievably ruined.

I respectfully dissent.

Schwab, C. J., and Tanzer and Lee, JJ., join in this dissenting opinion.