Argued and submitted September 12, 1988, affirmed May 10, 1989

In the Matter of Jessica Maria Oseguera
and Josephine Yolanda Oseguera, Children.

## STATE ex rel JUVENILE DEPARTMENT
## OF YAMHILL COUNTY et al,

*Respondents,*

*v.*

## OSEGUERA,
*Appellant.*

(J-5180; CA A46711)

773 P2d 775

Jerry B. Hart, McMinnville, argued the cause for appellant. With him on the brief was Craig, Brand, Lake & Hart, McMinnville.

Christine Chute, Assistant Attorney General, Salem, argued the cause for respondents. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Joseph, Chief Judge, and Deits, Judge.

DEITS, J.

### DEITS, J.

Mother appeals from an order terminating her parental rights to two of her children. She argues that the trial court erred in finding that the state proved by clear and convincing evidence that her rights should be terminated. We affirm.

Mother, 28, has four children, ages seven, five, four and three. This case involves the oldest and the youngest, Jessica and Josephine.[1] On November 24, 1985, mother went to dinner with friends at about 10:30 p.m. She had just returned from the hospital, after giving birth to Josephine four days before. She arranged for a teenager to watch the children and told her that she would return in two hours. When mother did not return, the babysitter called the police, who found the children in a run-down, rat-infested apartment. They were dirty and smelleuof urine. They had colds and distended stomachs; the two eldest children had worms; and Jessica had long, deep red lines running down her back and buttocks.

The next morning the case was referred to a Children's Services Division (CSD) caseworker. It was the fifth referral that the caseworker had received about possible neglect of the children in the past year. Mother came to the CSD office later that morning. She was angry and smelled of alcohol. She explained that she had gone to Portland and returned home at 4:30 a.m. She was upset that the children had been taken and blamed the sitter. She felt that the sitter should not have called the police. She stated later, at the termination hearing, that she had made "one stupid mistake" and that was "picking the wrong babysitter." Caseworkers questioned mother about how much she had been drinking the previous night. She stated that she had had only two brandies and denied that she had a drinking problem. A shelter hearing was held that day, and it was decided that the children would remain in shelter care, pending investigation of mother's circumstances. Mother agreed with CSD that it should keep the children until she could find a better place to live and complete a parenting program.

---

[1] Petitioner mistakenly identifies the children involved in this termination as the two youngest. The two middle children were returned to the care of their father in February, 1987. He is not the father of the children involved here.

On December 11, 1985, mother was taken into protective custody by the McMinnville police, because she was so intoxicated that she was "unable to take care of herself." On learning of that, the caseworker became concerned that mother did have an alcohol problem. She asked her to go to White Oaks Treatment Center for an evaluation. The caseworker indicated that, if White Oaks recommended treatment, CSD would arrange for it and, if not, because mother still did not have a place to live with her children, CSD would help her find a place to live and would return the children. When the White Oaks counselors saw mother in December, 1985, they found her to be extremely hostile and uncooperative. She admitted that she might have been an alcoholic before the birth of her children but denied that she now drank more than one beer at a time. The counselors concluded that she had an alcohol problem and recommended inpatient or residential treatment.

During the first visitations that mother had with her children, the caseworker was encouraged by the bonding that she saw and felt that there was a possibility that progress could be made. She arranged a regular visitation schedule for mother to see her children. From November, 1985, until February, 1986, mother was permitted to see the children weekly. However, she only saw them four or five times, either because she did not request visits or because she did not show up for scheduled visits. The children were quite upset when mother did not come. She was told of the effect of this on her children but continued to miss visits. Mother was also referred by CSD to parenting classes. She attended the orientation in December, 1985, but failed to fill out the questionnaire and never did enroll in the program.

On February 6, 1986, the children were made wards of the court. The court imposed three conditions that mother had to satisfy before her children would be returned: She had to enroll in and complete an alcohol treatment program; she had to establish and maintain regular visitation with the children; she had to participate in parenting classes. Mother was given a letter detailing the plan for the re-integration of the children to her custody. The letter made it clear that an inpatient alcohol program was a required first step. It also reminded her that she had yet to contact her caseworker to arrange a visitation schedule. Mother's response was hostile.

She did arrange and appear for weekly visits in February. However, she told the caseworker that she could not attend the alcohol program, because she was in a job training program. When the coordinator of the program was called, he indicated that she had only shown up for training twice and no longer came.

In March, 1986, the case was transferred to a permanent planning status.[2] That action was taken because mother refused to get alcohol treatment and consistently denied that she needed treatment. She was again informed that, in order for her to get her children back, she needed to comply with the court order. During the next thirteen months, she resisted alcohol treatment and repeatedly violated visitation rules. When the caseworker tried to talk to her, she reacted with aggression and anger. In the summer of 1986, she spent three months in jail and was placed on eight years probation after she was involved in a fight with her ex-husband's girlfriend and was convicted of harassment and theft. She was released from jail to White Oaks for inpatient alcohol treatment but was asked to leave the program because of her unwillingness to abide by program rules.

When the court reviewed mother's progress in September, 1986, it ordered her to submit to a psychological evaluation and once again ordered alcohol treatment. Dr. Sweet, psychologist, conducted a comprehensive psychological evaluation and concluded that mother has "a personality disorder that is very resistant to change" and a "significant problem with alcohol." Sweet assessed mother as a person who has difficulty understanding complex situations and difficulty acquiring and retaining new information. He described her as a resentful, angry, demanding and manipulative woman who will not take responsibility for her own behavior. He concluded that she has poor insight and lacks good judgment and blames other people for her own deficiencies and failures. Sweet noted that she had difficulty following through on tasks that require sustained effort and had difficulty learning from experience. Sweet did not consider her a good resource for the

---

[2] The goal in permanent planning is to set up a treatment plan and to arrange services and visitation for the parent designed to reintegrate the family. The plan establishes conditions and criteria that must be met before the children are returned and which, if not met, may result in termination of parental rights.

children "as long as mother denies having any problems and avoids working with CSD." He recommended that, if she continued to resist CSD's efforts it would be in the best interests of the children to terminate her parental rights.

On February 5, 1987, CSD decided to begin termination proceedings. Mother was informed of the decision on February 9. On February 15, she went to the home of her ex-husband, where her two other children had been placed. She was loud and threatening to the inhabitants and frightened the children. As a result of that incident, a restraining order was obtained against her. On February 26, mother accosted her ex-husband's girlfriend and harassed her and the children.

Mother's probation officer enrolled her in an outpatient alcohol treatment program, which she entered one month before the termination hearing. Her probation officer told her that she would be put in jail unless she went to the program, because she was in violation of the condition of her probation that required inpatient alcohol treatment. Mother missed the first session, attended the next two, but missed the session held the night before the termination hearing. At the time of the hearing, she still had not found a permanent residence and had not held a permanent job since the children were taken away.

The state must show by clear and convincing evidence that termination of parental rights is warranted. *State ex rel Juv. Dept. v. Herman,* 69 Or App 705, 687 P2d 812 (1984). Under ORS 419.523(2), our specific inquiry is whether a parent is

> "unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable in the foreseeable future due to conduct or conditions not likely to change."

In making that determination, we must consider:

> "(a) Emotional illness, mental illness or mental deficiency of the parent of such duration as to render it impossible to care for the child for extended periods of time.
>
> "* * * * *
>
> "(c) Addictive use of intoxicating liquors or controlled substances.
>
> "* * * * *

"(e)  Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

The evidence is clear and convincing that mother has an alcohol problem and that she has repeatedly failed to accept or follow through with its treatment. She has continued that course of conduct, despite the fact that it was made abundantly clear to her that she needed to deal with the problem in order to ensure the return of her children. *State ex rel Juv. Dept. v. McDonald,* 38 Or App 399, 590 P2d 289, *rev den* 286 Or 149 (1979).

There is also clear and convincing evidence that mother suffers from a personality disorder. Her rights cannot be terminated solely because she has an antisocial personality disorder. *State ex rel Juv. Dept v. Wyatt,* 34 Or App 793, 579 P2d 885, *rev den* 283 Or 503 (1978). However, as explained by the psychologist who evaluated her and as evidenced by her behavior, her personality problems have been a serious impediment to her ability to deal with her problems and to get herself into a condition in which she can adequately perform as a parent.

Mother has failed to adjust her circumstances to make the return of her children possible. She argues that CSD has never really given her a chance, that it has imposed arbitrary and irrational conditions on her and that her failure to get along with CSD does not justify terminating her parental rights. CSD is required to make reasonable efforts to assist parents in making adjustments that will enable them to function as effective parents. *State ex rel Juv. Dept. v. Habas,* 299 Or 177, 700 P2d 225 (1985); *State ex rel Juv. Dept v. Herman, supra,* 69 Or App 709-710; *State ex rel Juv. Dept v. H.,* 62 Or App 288, 659 P2d 1027 (1983). It did so here. The conditions imposed on mother were not arbitrary or unreasonable. CSD repeatedly attempted to assist her in complying with them, but she refused to work with CSD. Mother argues that CSD was aware of her personality disorder, but it never offered or arranged for her to receive psychological counseling. However, it was CSD's assessment that her alcohol problem had to be dealt with before psychological counseling could be effectively

undertaken. The psychologist who evaluated her at the request of the court concurred with the previous recommendations that the first step in her recovery was participation in an alcohol treatment program, which she failed to do.

It has also been established by clear and convincing evidence that mother's conduct and condition are seriously detrimental to the children. The state of care in which the children were found in November, 1985, was indicative of serious neglect. However, more germane to the decision to terminate mother's rights is her failure to make any improvement in her ability to provide minimally adequate care for the children. Mother has resisted alcohol treatment, she had no place for the children to live and she had no employment. She has made no substantial effort to maintain a relationship with the children or to nurture them. She missed visits with the children, which was upsetting to them, violated visitation rules and used the visitations to attempt to manipulate them in her battle with CSD and her ex-husband. Mother made no serious efforts to adjust her life so that she could get her children back and made only the most cursory attempts to conform to the plans made for her by CSD and the requirements that the plans imposed. Her alcohol problem and her personality disorder apparently prevented her from making adjustments to allow the return of her children and make it improbable that integration of the children into her home will occur in the foreseeable future. The trial court correctly granted the petition.

Affirmed.